1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   CHRISTOPHER KIRKPATRICK,           Case No. EDCV 13-02034 SS

12                  Plaintiff,

13        v.                            **MEMORANDUM DECISION AND ORDER**

14   CAROLYN W. COLVIN, Acting
     Commissioner of the Social
15   Security Administration,

16                  Defendant.

17

18

19

20                              **I.**

21                          **INTRODUCTION**

22

23        Christopher Kirkpatrick ("Plaintiff") seeks review of the

24   final decision of the Commissioner of the Social Security

25   Administration (the "Commissioner" or the "Agency") finding him

26   eligible for Disability Insurance Benefits and Supplemental

27   Security Income from January 22, 2011 through February 16, 2012,

28   but denying him those benefits after February 16, 2012 because of

medical improvement.   The parties consented, pursuant to 28
U.S.C. § 636(c), to the jurisdiction of the undersigned United
States Magistrate Judge.   For the reasons stated below, the
decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff applied for Title II Disability Insurance Benefits
("DIB") and Title XVI Supplemental Security Income ("SSI") on
January 31, 2011 and February 3, 2011 respectively.
(Administrative Record ("AR") 129, 136).   In both applications,
Plaintiff alleged a disability onset date of January 22, 2011.
(Id.).   The Agency initially denied Plaintiff's applications on
March 8, 2011, (AR 62-66), and upon reconsideration on June 24,
2011.   (AR 60-61).   On August 5, 2011, Plaintiff requested a
hearing before an Administrative Law Judge ("ALJ").   (AR 73).
Plaintiff testified before ALJ Marti Kirby on September 7, 2012.
(AR 32-57).   The ALJ subsequently issued a partially favorable
decision on September 25, 2012.   (AR 10-26).   The ALJ found that
Plaintiff was disabled within the meaning of the Social Security
Act from January 22, 2011 to February 16, 2012.   (AR 26).   The
ALJ concluded, however, that Plaintiff's disability ended on
February 17, 2012 due to medical improvement.   (AR 10-11).   On
October 10, 2012, Plaintiff requested review of the ALJ's
decision, which the Appeals Council denied on September 18, 2013.
(AR 1-5).   Plaintiff filed the instant action on November 15,
2013.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.

### FACTUAL BACKGROUND

Plaintiff was born on November 6, 1978 and was thirty-two years old on the date that he allegedly became disabled. (AR 35). Plaintiff did not graduate high school or obtain a GED. (AR 36). Plaintiff alleged that he could not engage in substantial gainful activity after January 22, 2011 due to Stage IV Hodgkin's lymphoma. (AR 175, 178). Plaintiff also claimed that he suffered from blood clots in his arms, fatigue due to chemotherapy, deep vein thrombosis ("DVT") in his shoulders, and peripheral neuropathy in his feet and hands. (AR 198, 216). Plaintiff's examining physicians found that these symptoms decreased in severity in the months following Plaintiff's last cycle of chemotherapy on October 14, 2011. (AR 458). On June 5, 2012, Plaintiff underwent surgery on his right knee to repair a torn meniscus suffered in January of 2012, which resulted in a Grade IV cartilage change to the knee. (AR 365).

Plaintiff also claimed he suffered from severe depression. (AR 22). Plaintiff visited a mental health facility in January of 2012. (AR 349). Examining physicians concluded Plaintiff was depressed, but was not a risk to himself or others and recommended that Plaintiff begin counseling. (AR 349, 352). Plaintiff was later prescribed the antidepressant medication Lexapro in May of 2012. (AR 390, 392).

3

**A.  Medical History: Treating And Examining Physicians' Findings**

      **1.  Physical Condition**

    On January 22, 2011, Plaintiff presented to the Desert Regional Medical Center ("Desert Regional") in Palm Springs, California with fatigue, malaise, a lack of energy and weight loss. (AR 235). On January 25, 2011, Plaintiff underwent a left inguinal lymph node biopsy which revealed that Plaintiff had Stage IV Hodgkin's lymphoma with bone marrow involvement. (AR 241-44, 275). Plaintiff commenced chemotherapy in early 2011 and started taking Coumadin for "bilateral upper extremity DVT caused by his malignancy[.]" (AR 275). On March 9, 2011, Plaintiff's physician at Desert Regional's Comprehensive Cancer Center ("Cancer Center"), Dr. Murthy Andavolu, reported that Plaintiff was "doing well," having regained his appetite, and gained a "significant amount" of weight. (Id.). Plaintiff reported no nosebleeds or gum bleeding, no blood in his stool, no fevers or night sweats, no neck pain or swelling, no abdominal pain, and no leg swelling. (Id.).

    On March 23, 2011, Plaintiff saw Dr. Andavolu for a follow-up visit. (AR 277). Plaintiff reported continued weight gain, and his exam was otherwise unremarkable. (Id.). Plaintiff remained on Coumadin for his DVT and continued to undergo chemotherapy. (Id.). Plaintiff returned to Dr. Andavolu on April 13, 2011 after completing his third cycle of chemotherapy. (AR 279). Plaintiff reported no complaints and continued to

receive treatment for his DVT. (Id.). On May 4, 2011, nurse practitioner Cathy Warne conducted a follow-up examination of Plaintiff. (AR 282). Plaintiff complained of itchy eyes, nasal congestion, and tenderness in his mouth. (Id.). He reported purposeful weight loss, but no headaches, fevers, night sweats, abdominal pain, chest pain, swelling, or shortness of breath. (Id.). Nurse Warne reported that Plaintiff "tolerated [his] chemotherapy well and had a good clinical response." (Id.). Plaintiff's PET-CT scan showed a "complete response." (Id.) Dr. Andavolu confirmed the nurse's findings in an additional report and noted he increased Plaintiff's Coumadin to 7.5 mg daily two days earlier. (AR 284).

On May 11, 2011, Plaintiff underwent a bone marrow biopsy. (AR 286). Plaintiff tolerated the procedure well, (id.), and a microscopic examination of his biopsied bone marrow revealed no evidence of Hodgkin's lymphoma. (AR 290). On June 1, 2011, Plaintiff reported muscle and bone aches, but no other remarkable symptoms. (AR 467). Dr. Andavolu noted on June 30, 2011 that Plaintiff continued to gain weight, his groin lymphadenopathy had disappeared, and he reported no chest or abdominal pain. (AR 466). Plaintiff continued to do well throughout July 2011 and showed signs of near-complete resolution of his Hodgkin's lymphoma. (AR 464). Plaintiff also improved throughout August 2011, showing no signs of fever, swelling, weight loss, chest pain, abdominal pain, or distress. (AR 462). Plaintiff continued to tolerate his chemotherapy well throughout September 2011. (AR 460). After briefly increasing Plaintiff's Coumadin

5

1    to 10 mg daily in late August 2011, Dr. Andavolu lowered

2    Plaintiff's dose back to 7.5 mg daily on September 22, 2011. (AR

3    462, 460).

4

5    On October 3, 2011, Plaintiff visited Dr. Apollo Gulle in

6    Yucca Valley, California to discuss his lab results. (AR 342).

7    Plaintiff reported no fatigue, fever, night sweats, coughing,

8    chest pain, irregular heartbeat, abdominal pain, constipation,

9    diarrhea, or vomiting. (Id.). Plaintiff was not under any

10    apparent distress, appeared well-nourished, and well-developed.

11    (Id.). Plaintiff's lungs were clear, his heart rhythm was

12    regular, his abdomen was soft and non-tender, and his extremities

13    showed no signs of edema or cyanosis. (Id.). Dr. Gulle noted

14    that Plaintiff's cancer was in remission and his DVT in the upper

15    extremities remained chronic. (Id.). Dr. Gulle prescribed

16    Plaintiff Fenofibrate (160 mg) and Nexium (40 mg), and modified

17    his Coumadin dosage to 5 mg. (AR 343). At the time of his

18    visit, Plaintiff weighed 234 pounds. (AR 342).

19

20    On October 19, 2011, Plaintiff visited Dr. Andavolu for a

21    follow-up appointment. (AR 458). Dr. Andavolu reported that

22    Plaintiff was doing well after completing his last cycle of

23    chemotherapy on October 14, 2011. (Id.).

24

25    On November 22, 2011, Plaintiff returned to Dr. Gulle for a

26    follow-up examination. (AR 340). Plaintiff reported itchy and

27    dry feet, but no other remarkable symptoms. (Id.). Dr. Gulle

28    prescribed Lidex solution (.05%) for Plaintiff's skin condition

1    and Plaintiff continued to take Fenofibrate, Coumadin and Nexium.
2    (Id.).  At the time of his visit, Plaintiff weighed 237 pounds.

3

4        On December 8, 2011, Plaintiff again presented with no signs
5    of fatigue, fever, night sweats, distress, respiratory problems,
6    or any other remarkable complications.  (AR 338).  Plaintiff
7    reported chest congestion, an itchy throat, a runny nose and body
8    aches.  (Id.).  Dr. Gulle prescribed Plaintiff amoxicillin (500
9    mg) in addition to his regular medications.  (AR 339).  Plaintiff
10   weighed 236 pounds at the time of his examination.  (AR 338).

11

12       Plaintiff returned to Dr. Gulle on January 16, 2012
13   complaining of a swollen right knee due to an attempt to return
14   to work as a construction worker.  (AR 336).  Dr. Gulle noted
15   that although Plaintiff experienced swelling and pain in his
16   right knee, x-rays of the knee were unremarkable and Plaintiff
17   reported no history of trauma, weakness or numbness.  (Id.).  Dr.
18   Gulle diagnosed Plaintiff with a sprained right knee and
19   recommended treatment with NSAIDs, ice and a wearable
20   immobilizer.  (Id.).

21

22       On January 18, 2012, Plaintiff returned to Dr. Andavolu.
23   (AR 457).  Dr. Andavolu noted that Plaintiff's cancer was in
24   complete remission, although his DVT persisted.  (Id.).
25   Plaintiff complained of an injury to his right knee, which
26   required the use of crutches.  (Id.).  Plaintiff reported no
27   additional complaints.  (Id.).

28

1    On February 1, 2012, Plaintiff visited Dr. Jeffrey Seip in

2  Yucca Valley for a knee examination.  (AR 422).  Plaintiff

3  reported mild joint pain and denied any locking, popping, or

4  other mechanical symptoms of the right knee.  (Id.).  Plaintiff

5  also described a stable and nonprogressive pattern of symptoms.

6  (Id.).  Dr. Seip concluded Plaintiff was not at risk of falling,

7  diagnosed Plaintiff with a sprain of the right lateral collateral

8  knee ligament, and referred Plaintiff to physical therapy.  (AR

9  423).

10

11    At a February 8, 2012 physical therapy session, Plaintiff

12  reported mild to moderate knee pain, which the physical therapist

13  noted was "significantly decrease[d]" by his knee brace.  (AR

14  359).  The physical therapist began Plaintiff on a treatment plan

15  that included therapeutic and strengthening exercises, electric

16  stimulation, and hot/cold packs, with a frequency of one

17  treatment per day, twice a week for six weeks.  (AR 360).

18

19    Plaintiff returned to Dr. Andavolu on February 16, 2012 for

20  a follow-up visit regarding Plaintiff's lymphoma.  (AR 451).  Dr.

21  Andavolu reiterated that Plaintiff was doing well and noted that

22  Plaintiff had stopped taking Coumadin for his DVT two weeks

23  earlier.  (AR 451).  Plaintiff's right knee showed signs of

24  swelling and tenderness.  (AR 452).

25

26    On February 20, 2012, Plaintiff visited Dr. Chahat Thakur in

27  Yucca Valley for a variety of lab tests related to his lymphoma.

28  (AR 419).  There, Plaintiff reported that he was still taking

8

1   Coumadin at that time, in contrast to what Dr. Andavolu noted
2   about Plaintiff's Coumadin dosage four days earlier. (AR 420).

4       Plaintiff also listed Coumadin as a current medication the
5   following day, during a follow-up appointment for his knee. (AR
6   416). Nurse practitioner Hector Alvarez reported Plaintiff had
7   no pain during several knee examinations, but did note lateral
8   joint line tenderness during an exam of Plaintiff's right
9   meniscus. (AR 418). Plaintiff underwent a procedure to drain
10  the right knee joint of fluid and reported no complications
11  afterwards. (Id.). Nurse Alvarez ordered Plaintiff to continue
12  with physical therapy. (Id.).

14      On March 5, 2012, Plaintiff returned to Dr. Thakur for
15  further lab tests, this time to evaluate Plaintiff for
16  hypertriglyceridemia. (AR 413). Dr. Thakur noted Plaintiff was
17  taking Lopid for the condition, and had been complying with the
18  treatment and taking his medicine as directed. (Id.). Plaintiff
19  denied experiencing any symptoms related to hypertriglyceridemia.
20  (Id.). Dr. Thakur prescribed Tricor (145 mg), to be taken once
21  daily for 30 days, with two refills following. (AR 414).
22  Plaintiff did not list Coumadin as one of his current medications
23  at this visit. (Id.). Plaintiff weighed 246 pounds at the time
24  of his examination. (Id.).

26      Plaintiff returned to Nurse Alvarez on March 6, 2012 for a
27  follow-up appointment on his knee and was referred for more
28  physical therapy. (AR 410). During sessions held on March 14

9

and March 29, 2012, Plaintiff continued to report mild to moderate knee pain, and the physical therapist remarked that Plaintiff was making slow progress at both sessions. (AR 362). Plaintiff was discharged from physical therapy following the March 29, 2012 session. (AR 363).

On March 27, 2012, Plaintiff visited Dr. Navid Zenooz for a chest x-ray and CT scan of his abdomen and pelvis after experiencing abdominal pain. (AR 356, 428). Dr. Zenooz reported that the CT scan revealed Plaintiff was suffering from umbilical and bilateral inguinal hernias. (AR 356). Dr. Zenooz otherwise reported unremarkable and normal findings from both examinations. (AR 356, 428). The next day, Dr. Thakur referred Plaintiff to a general surgeon for the hernias. (AR 406).

On April 10, 2012, Plaintiff visited Dr. Renato Guzman in Yucca Valley following Dr. Thakur's referral. (AR 399). Dr. Guzman noted that both of Plaintiff's hernias "have been present for years," and that "[t]he umbilical hernia only bothers [Plaintiff] when he lays on his stomach. The inguinal hernias are asymptomatic." (Id.). Dr. Guzman's notes reveal no other assessments or orders for further treatment. (AR 399-400). Plaintiff also did not list Coumadin as one of his current medications. (AR 400). Plaintiff weighed 241 pounds at the time of his examination with Dr. Guzman. (Id.).

Plaintiff returned to Nurse Alvarez on May 9, 2012 for a follow-up appointment on his knee. (AR 393). Nurse Alvarez

10

referred Plaintiff to an orthopedist and also ordered an x-ray of Plaintiff's knee. (AR 395). Plaintiff weighed 236 pounds at the time of his visit with Nurse Alvarez. (AR 394).

On May 17, 2012, Plaintiff returned to Dr. Andavolu for a follow-up appointment regarding his lymphoma. (AR 445). Dr. Andavolu reported Plaintiff had a high red blood cell count, stemming from Plaintiff's history of smoking, but noted that Plaintiff was doing well otherwise and his lymphoma was in "complete remission." (Id.). Dr. Andavolu also commented that Plaintiff admitted to smoking marijuana. (Id.). Plaintiff was ordered to undergo lab tests and a PET-CT scan and follow up with Dr. Andavolu in another three months. (Id.).

On May 29, 2012, Plaintiff saw Nurse Alvarez for a pre-operation appointment on his knee. (AR 386). Plaintiff reported moderate pain in the knee. (Id.). Nurse Alvarez noted Plaintiff had a family history of osteoarthritis. (Id.). Plaintiff described joint stiffness, as well as locking, popping, and giving away of his knee. (Id.). Plaintiff told Nurse Alvarez these symptoms occurred for less than fifteen minutes upon waking up each morning, but later said his symptoms occurred several times daily. (Id.). Plaintiff estimated he could walk five to ten blocks, walk up stairs normally, and walk down stairs with a rail. (Id.). Plaintiff denied the need of an assistive device during any of these estimated activities. (Id.). Plaintiff weighed 233 pounds at the time of his visit with Nurse Alvarez, and did not report Coumadin as one of his current medications.

1    (AR 387-388).   Nurse Alvarez prescribed Plaintiff thirty tablets
2    of  Norco,  a  hydrocodone/acetaminophen  medication,  with  no
3    refills.  (AR 388).

4

5       Plaintiff underwent arthroscopic surgery on his right knee
6    on June 5, 2012 in Yucca Valley.  (AR 365).  Dr. Seip performed
7    the surgery and made a post-operation diagnosis of Grade IV
8    cartilage change to the majority of Plaintiff's right knee joint.
9    (Id.).   Dr. Seip reported no other complications from the
10   procedure.  (Id.).

11

12      Plaintiff returned to Nurse Alvarez on June 12, 2012 for a
13   post-operation appointment.  (AR 383).  Nurse Alvarez noted
14   "[Plaintiff's] course has improved," and that despite Plaintiff's
15   family history of osteoarthritis, Plaintiff's personal medical
16   history was negative for the condition.  (Id.).  Nurse Alvarez
17   also reported that Plaintiff had been prescribed Vicodin
18   following the surgery.  (Id.).  Nurse Alvarez reported similar
19   findings one week later on June 19, 2012, and ordered Plaintiff
20   to visit Dr. Seip to remove Plaintiff's remaining sutures.  (AR
21   379-381).

22

23      On June 20, 2012, Plaintiff visited Dr. Thakur to treat a
24   toenail fungal infection that Plaintiff claimed had been
25   bothering him for about six days.  (AR 376).  Dr. Thakur
26   confirmed the infection on the right toenail and prescribed
27   Plaintiff antibiotics.  (AR 378).

28

1      Plaintiff saw Dr. Thakur again on June 27, 2012 for a
2   follow-up appointment regarding Plaintiff's hypertriglyceridemia.
3   (AR 373).  Plaintiff denied experiencing any symptoms related to
4   the condition and Dr. Thakur noted Plaintiff's overall compliance
5   with the treatment plan.  Dr. Thakur prescribed Plaintiff Crestor
6   (20 mg), to be taken once daily for 30 days with no refills.  (AR
7   375).

8

9      On July 2, 2012, Plaintiff visited Nurse Alvarez for a
10  follow-up appointment on Plaintiff's knee.  (AR 370).  During the
11  patellofemoral and meniscal exams, Nurse Alvarez noted some
12  tenderness in Plaintiff's medial and lateral joint lines.  (AR
13  372).  Nurse Alvarez prescribed Plaintiff Naprosyn, a naproxen
14  medication, to be taken twice daily for 10 days.  (Id.).

15

16     Plaintiff visited Dr. Renato Guzman in Yucca Valley on July
17  3, 2012 to address his toenail infection.  (AR 368).  Dr. Guzman
18  reported no infection, but that examinations revealed ingrown
19  toenails on both of Plaintiff's big toes, and recommended
20  surgery.  (AR 369).  However, there is no other evidence in the
21  medical records indicating Plaintiff has undergone any such
22  procedure.

23

24     On August 14, 2012, Plaintiff visited Dr. Sumit Mahajan in
25  Yucca Valley for an appointment regarding Plaintiff's peripheral
26  neuropathy.  (AR 635).  Dr. Mahajan notes the condition was
27  "diagnosed [six] months ago."  (Id.).  Dr. Mahajan also remarked
28  that "[t]he course has been progressively worsening" and is of

1  "moderate intensity." (Id.). Plaintiff reported symptoms that

2  occurred several times daily, were aggravated by walking and

3  exertion, and were relieved by "lying perfectly still." (Id.).

4  Dr. Mahajan prescribed Plaintiff thirty tablets of Neurontin (300

5  mg) to control the nerve pain. (AR 637).

6

7      Plaintiff saw Dr. Thakur on August 20, 2012 after

8  experiencing shortness of breath, which Dr. Thakur noted had

9  bothered Plaintiff "for the past [two] weeks." (AR 632).

10  Plaintiff reported an associated cough symptom but denied any

11  other symptoms. (Id.). Dr. Thakur noted Plaintiff's CT scan of

12  his chest was negative for a pulmonary embolism and that all

13  other examinations were unremarkable. (AR 643, 633-634).

14  However, because of Plaintiff's history of cancer, Dr. Thakur

15  recommended Plaintiff visit Dr. Andavolu two days later for a

16  follow-up appointment. (AR 634). Plaintiff later testified

17  before the ALJ that he never received a diagnosis from the August

18  20, 2012 visit but was eventually prescribed an inhaler. (AR

19  42).

20

21      2.   **Mental Condition**

22

23      On January 23, 2012, Plaintiff visited Morongo Basin Mental

24  Health Services ("Morongo Basin") in Yucca Valley. (AR 349).

25  Plaintiff reported experiencing stress and anxiety due to

26  unemployment, his cancer diagnosis, and finances. (Id.).

27  Plaintiff was treated by examining clinician Dana Conner and Dr.

28  Paul True, Psy. D. (AR 349, 354). Ms. Conner reported Plaintiff

14

also complained of irritability, trouble sleeping, short term memory lapses, "lash[ing] out if confronted with too many tasks," and emotions that "change drastically." (Id.). However, later in the same report, boxes were checked indicating Plaintiff had neither sleeping nor eating problems. (AR 351). Plaintiff reported no other interpersonal impairment. (AR 349). Plaintiff used marijuana a few times a week, but "ceased using speed 15 years ago." (AR 350).

Dr. True diagnosed Plaintiff with chronic adjustment disorder with anxiety, cannabis dependence without physiological dependence, memory impairment due to chemotherapy, and chronic pain. (AR 354). Dr. True also diagnosed Plaintiff with hypercholesterolemia, digestive disorders, ulcers, inadequate social support, and occupational problems. (Id.). The doctors also concluded Plaintiff was not a danger to himself or others. (AR 349). They ruled Plaintiff's appearance and behavior as "appropriate/normal" and Plaintiff's mood as "depressed." (AR 352). The doctors recommended that Plaintiff begin counseling. (Id.).

On May 14, 2012, Plaintiff visited Dr. Thakur to evaluate Plaintiff for depression. (AR 390). Dr. Thakur noted this appointment was a "routine follow-up" and that "[t]he diagnosis of depression was made [ten] years ago." (Id.). Plaintiff reported a "mild degree of depression" with "fairly infrequent" symptoms to Dr. Thakur. (Id.). Dr. Thakur also noted that "[c]urrent medications include an antidepressant," but Plaintiff

15

did not report any such medications at the May 14, 2012 appointment or at other doctor visits leading up to May 14, such as the appointments on April 11 and May 9, 2012. (AR 391, 397, 394). Dr. Thakur prescribed Plaintiff thirty tablets of Lexapro, to be taken once daily, with no refills. (AR 392).

Plaintiff subsequently reported Lexapro as a current medication at doctor visits on May 29 and June 12, 2012. (AR 387, 384). Plaintiff then did not list Lexapro as a current medication during visits on June 19, June 20, or June 27, 2012. (AR 380, 377, 374). However, Plaintiff again listed Lexapro as one of his medications during doctor visits in August, 2012. (AR 638, 636, 633).

**IV.**

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180

16

1  F.3d 1094,  1098  (9th  Cir.  1999)  (citing  42  U.S.C.

2  § 423(d)(2)(A)).

3

4      To  decide  if  a  claimant  is  entitled  to  benefits,  an  ALJ

5  conducts  a  five-step  inquiry.   20 C.F.R. §§ 404.1520, 416.920.

6  The steps are:

7

8          (1)  Is  the  claimant  presently  engaged  in  substantial

9               gainful  activity?   If  so,  the  claimant  is  found

10              not disabled.  If not, proceed to step two.

11         (2)  Is  the  claimant's  impairment  severe?   If  not,  the

12              claimant  is  found  not  disabled.   If  so,  proceed  to

13              step three.

14         (3)  Does  the  claimant's  impairment  meet  or  equal  one

15              of  the  specific  impairments  described  in  20 C.F.R.

16              Part  404,  Subpart  P,  Appendix  1?   If  so,  the

17              claimant  is  found  disabled.   If  not,  proceed  to

18              step four.

19         (4)  Is  the  claimant  capable  of  performing  his  past

20              work?  If so, the claimant is found not disabled.

21              If not, proceed to step five.

22         (5)  Is  the  claimant  able  to  do  any  other  work?   If

23              not,  the  claimant  is  found  disabled.   If  so,  the

24              claimant is found not disabled.

25

26  Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari,

27  262  F.3d  949,  953-54  (9th  Cir.  2001)  (citations  omitted);  20

28  C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

1    The claimant has the burden of proof at steps one through
2    four, and the Commissioner has the burden of proof at step five.
3    Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an
4    affirmative duty to assist the claimant in developing the record
5    at every step of the inquiry.  Id. at 954.  If, at step four, the
6    claimant meets her burden of establishing an inability to perform
7    past work, the Commissioner must show that the claimant can
8    perform some other work that exists in "significant numbers" in
9    the national economy, taking into account the claimant's residual
10   functional capacity ("RFC"), age, education, and work experience.
11   Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20
12   C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do
13   so by the testimony of a vocational expert or by reference to the
14   Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404,
15   Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock
16   v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant
17   has both exertional (strength-related) and non-exertional
18   limitations, the Grids are inapplicable and the ALJ must take the
19   testimony of a vocational expert.  Moore v. Apfel, 216 F.3d 864,
20   869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335,
21   1340 (9th Cir. 1988)).

22

23                                **V.**

24                        **THE ALJ'S DECISION**

25

26   The ALJ employed the five-step sequential evaluation process
27   and concluded that Plaintiff was initially under a disability
28   within the meaning of the Social Security Act from January 22,

18

2011 through February 16, 2012.  (AR 10).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since January 22, 2011. (AR 14).

At step two, the ALJ found that from January 22, 2011 through February 16, 2012, Plaintiff had the severe impairments of Stage IV Hodgkin's lymphoma with bone marrow involvement, currently in remission after eight months of chemotherapy, but with complications due to DVT in both shoulders and residual peripheral neuropathy; depression; and obesity.  (AR 14).

At step three, the ALJ found that during this period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 15).

The ALJ then found that Plaintiff was "unable to sustain full time work activity on a regular and continuing basis because of chronic fatigue, and the frequency and effect of medical treatment."  (AR 16).  In making this finding, the ALJ noted that the objective medical evidence supported the credibility of Plaintiff's testimony, as well as written statements from Plaintiff and his wife, regarding the severity of his symptoms and limitations.  (AR 17-18).

Consequently, the ALJ gave little weight to the opinions of the non-examining State physicians at the initial and

reconsideration levels, who "did not have the benefit of considering additional evidence that was only available after they assessed [Plaintiff], including treatment notes and [Plaintiff's] testimony at the hearing," and who thereby failed to "adequately consider [Plaintiff's] subjective allegations." (AR 18-19). In particular, the ALJ noted that the initial non-examining physician, Dr. Vu, expected Plaintiff "to be functionally nonsevere after 12 months from the [alleged onset date]," and Dr. Cooper, the non-examining physician at the reconsideration level, expected that after the same 12 month period, Plaintiff "would be able to perform work at the light exertional level . . . [and] occasionally perform postural activities." (AR 18).

At step four, the ALJ determined that Plaintiff could not perform his relevant past work as a construction worker. (AR 19). At step five, the ALJ considered Plaintiff's age, education, work experience and RFC and determined that "there were no jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed." (Id.). The ALJ noted that "[Plaintiff's] limitations prevented the performance of sustained work-related physical activities in a work setting on a regular and continuing basis at any exertional level." (AR 20). Thus, the ALJ found after the five-step evaluation that Plaintiff was disabled, as defined by the Social Security Act, from January 22, 2011 through February 16, 2012. (AR 20).

However, the ALJ then determined that beginning February 17, 2012, Plaintiff experienced medical improvement that increased Plaintiff's RFC, despite retaining all pre-existing impairments. (AR 21-22).   Thus, because Plaintiff's increased RFC improved Plaintiff's ability to work, the ALJ found that Plaintiff's disability ended as of February 17, 2012.  (AR 21).   The ALJ then provided the following description of Plaintiff's increased RFC:

> [Plaintiff] can lift and/or carry 20 pounds occasionally and 10 pounds frequently; he can stand and/or walk for six hours out of an eight-hour workday with regular breaks; he can sit for six hours out of an eight-hour workday with regular breaks; he can alternate between sitting and standing at one hour intervals; he can frequently perform postural activities; he is precluded from climbing ladders, ropes, or scaffolds; he is precluded from working at heights, around moving machinery or other hazards; he is precluded from performing jobs that requires hypervigilance or intense concentration on a particular task; and he is precluded from concentrated exposure to extreme temperatures.

(AR 22).  In contrast to the ALJ's previous disability finding, the ALJ found the objective medical evidence inconsistent with both Plaintiff's testimony and the written statements from Plaintiff and his wife regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms since February 17, 2012.

(AR 22).   As a result, the ALJ found Plaintiff's subjective complaints were "less than fully credible." (AR 24.)

More specifically, the ALJ took issue with Plaintiff's statements regarding the severity of the three main impairments allegedly limiting Plaintiff's ability to work after February 16, 2012: the ongoing effects of Plaintiff's June 5, 2012 surgery on his right knee; Plaintiff's severe residual fatigue and weakness upon completion of chemotherapy; and Plaintiff's ongoing depression.   (AR 22-24).

Regarding Plaintiff's knee surgery, the ALJ disagreed with Plaintiff's contention that the surgery failed.   (AR 22, 43). The ALJ noted Plaintiff's gait was normal while moving about the hearing room and that Plaintiff did not use an assistive device for ambulation.   (AR 22).   Furthermore, Plaintiff admitted to the ALJ during the hearing that he could stand and/or walk for over an hour and vacuum at home.   (Id.).   The ALJ also noted that Plaintiff admitted at a post-operative appointment that he could walk five to ten blocks, climb stairs normally, and had only occasional, moderate pain in his knee.   (Id.).

Similarly, the ALJ concluded the objective evidence for Plaintiff's progress following chemotherapy did not support Plaintiff's allegations of continued severe residual fatigue and weakness.   (Id.).   The ALJ found no evidence in the medical records that Plaintiff ever reported such symptoms to a physician during a follow-up appointment, but notes that Plaintiff did in

22

1   fact on several occasions deny having any ill effects. (Id.).

2   Further, the ALJ pointed to diagnostic testing that "revealed

3   unremarkable findings" during this period. (Id.).

4

5       Lastly, the ALJ found no support in the record for claims

6   that Plaintiff and his wife made regarding the severity of

7   Plaintiff's depression. (Id.). The ALJ noted that "on several

8   occasions, [Plaintiff] described his depression as 'mild,' and

9   stated that his symptoms are infrequent," and that Plaintiff

10  admitted to not receiving ongoing mental health treatment beyond

11  an initial prescription for medication. (Id.). The ALJ also

12  acknowledged the lack of any evidence that Plaintiff was

13  hospitalized for mental impairments. (AR 22-23). For these

14  reasons, the ALJ found testimony from Plaintiff's wife that

15  Plaintiff continued to experience problems with his memory,

16  fatigue, and pain to be lacking credibility in light of the lack

17  of clinical or diagnostic medical evidence. (AR 23).

18

19      In finding the Plaintiff's RFC had increased, the ALJ gave

20  some weight to the opinions of the State non-examining physicians

21  at the reconsideration level, who concluded that "beginning on

22  January 22, 2012, [Plaintiff] could perform work at the light

23  exertional level; he could occasionally perform postural

24  activities; and he was precluded from concentrated exposure to

25  pulmonary irritants and temperature extremes." (AR 24).

26  However, the ALJ determined that while "this opinion is generally

27  consistent with the totality of the medical evidence . . . this

28

1  opinion does not adequately consider [Plaintiff's] obesity or his

2  subjective allegations of knee pain and residual fatigue."

3

4      Taking Plaintiff's obesity and subjective allegations into

5  consideration, the ALJ assigned Plaintiff a more restrictive, and

6  thus more favorable, RFC to accommodate the deficiencies the ALJ

7  perceived in the opinions of the non-examining physicians.  (AR

8  22, 24).  Returning to step four, the ALJ determined that even

9  with an increased RFC, Plaintiff was still unable to perform his

10  relevant past work as a construction worker.  (AR 24-25).  At

11  step five, the ALJ considered Plaintiff's age, education, work

12  experience, and increased RFC.  (AR 25).  Based in part on the

13  testimony of a vocational expert, the ALJ found that there were

14  jobs existing in significant numbers in the national economy that

15  Plaintiff could perform as of February 17, 2012, such as a

16  cashier, garment sorter, and production solderer.  (Id.).

17  Accordingly, the ALJ determined that Plaintiff was no longer

18  disabled as of February 17, 2012.  (Id.).

19

20                                **VI.**

21                      **STANDARD OF REVIEW**

22

23      Under 42 U.S.C. § 405(g), a district court may review the

24  Commissioner's decision to deny benefits.  The court may set

25  aside the Commissioner's decision when the ALJ's findings are

26  based on legal error or are not supported by substantial evidence

27  in the record as a whole.  Aukland v. Massanari, 257 F.3d 1033,

28  1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen

                                  24

1  v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v.

2  Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

3

4      "Substantial evidence is more than a scintilla, but less

5  than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson

6  v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant

7  evidence which a reasonable person might accept as adequate to

8  support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066;

9  Smolen, 80 F.3d at 1279). To determine whether substantial

10  evidence supports a finding, the court must "'consider the record

11  as a whole, weighing both evidence that supports and evidence

12  that detracts from the [Commissioner's] conclusion.'" Aukland,

13  257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

14  Cir. 1993)). If the evidence can reasonably support either

15  affirming or reversing that conclusion, the court may not

16  substitute its judgment for that of the Commissioner. Reddick,

17  157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457

18  (9th Cir. 1995)).

19

20                              **VII.**

21                          **DISCUSSION**

22

23      Plaintiff contends the ALJ "erred in holding that

24  Plaintiff's disability ended on February 16, 2012." (Memorandum

25  in Support of Plaintiff's Complaint ("MSPC") at 2). Plaintiff

26  makes two specific challenges to the ALJ's decision. First,

27  Plaintiff argues that pursuant to Social Security Ruling ("SSR")

28  96-8p ("the Ruling"), the second RFC assessment that led to the

                              25

determination of non-disability is erroneous because "the ALJ failed to provide a proper narrative discussion describing how the evidence supports her conclusion that Plaintiff became able to perform a limited range of light work on February 17, 2012." (Id. at 3) (citing SSR 96-8p, 1996 WL 374184). Second, Plaintiff claims that also pursuant to the Ruling, "the ALJ failed to resolve the numerous ambiguities present in the medical evidence that she relied on in reaching her decision." (Id. at 5).

The Court disagrees with Plaintiff on both grounds. The ALJ provided substantial evidence to support her RFC assessment and provided clear and convincing reasons for finding Plaintiff's subjective testimony less than fully credible. To the extent that the medical evidence after February 17, 2012 presented any material ambiguities, the ALJ properly discussed and resolved them with citations to substantial evidence from the objective medical record. Accordingly, for the reasons discussed below, the ALJ's decision must be AFFIRMED.

A.   **The ALJ Adequately Supported Her RFC Assessment**

Plaintiff contends the ALJ did not properly support her RFC assessment because the decision "relies on a handful of clinical observations that may or may not indicate that Plaintiff's condition improved" as of February 17, 2012. (MSPC at 3). The Court disagrees, and finds the ALJ supported her RFC assessment with extensive citation to and discussion of both medical and nonmedical evidence contained in the record.

1       **1.   SSR 96-8P And The Relevant Legal Standard**

2

3       The Ruling provides that the RFC assessment "is a function-

4   by-function assessment based upon all of the relevant evidence of

5   an individual's ability to do work-related activities," which

6   also "must include a narrative discussion describing how the

7   evidence supports each conclusion...." SSR 96-8p, 1996 WL 374184

8   at 3-7. In particular, the ALJ must "cit[e] specific medical

9   facts (e.g., laboratory findings) and nonmedical evidence (e.g.,

10  daily activities, observations)," and address "the individual's

11  ability to perform sustained work activities in an ordinary work

12  setting on a regular and continuing basis (i.e., 8 hours a day,

13  for 5 days a week, or an equivalent work schedule)." (Id. at 7).

14  In addition, the ALJ must "describe the maximum amount of each

15  work-related activity the individual can perform based on the

16  evidence available in the case record." (Id.).

17

18      When discussing cases in which subjective symptoms, such as

19  pain, are alleged, the RFC assessment "must include a discussion

20  of why reported symptom-related functional limitations and

21  restrictions can or cannot reasonably be accepted as consistent

22  with the medical and other evidence." (Id.). Similarly, when

23  considering medical opinions, "[i]f the RFC assessment conflicts

24  with an opinion from a medical source, the adjudicator must

25  explain why the opinion was not adopted." (Id.). "If a treating

26  source's medical opinion on an issue of the nature and severity

27  of an individual's impairment(s) is well-supported by medically

28  acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight." (Id.).

SSR rulings are binding on an ALJ. 20 C.F.R. § 402.35(b)(1). When the ALJ fails to identify specific reasons for the stated findings, supported by evidence in the case record, the Court cannot affirm an ALJ's determination "even if the ALJ had given facially legitimate reasons for his . . . finding, [because] the complete lack of meaningful explanation gives [the Court] nothing with which to assess its legitimacy." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 884 (9th Cir. 2006).

**2.    Substantial Evidence Supports The ALJ's Finding That Plaintiff Was Not Disabled Beginning February 17, 2012**

The Court finds the ALJ supported her finding that Plaintiff was no longer disabled after February 17, 2012 with substantial evidence.  The ALJ provided evidence of Plaintiff's improved condition and continuing limitations as of February 16, 2012, and also discussed how she reconciled her conclusions with any conflicting evidence from Plaintiff's own testimony or other medical opinions.

As required by the Ruling, the ALJ cited to several "specific medical facts" that show Plaintiff's condition improved.  SSR 96-8p, 1996 WL 374184 at 7.  The ALJ stated:

1      The evidence shows [Plaintiff] completed chemotherapy

2      in October 2011. [Plaintiff's] cancer went into

3      remission, and his condition has been stable since he

4      completed cancer treatments. Although [Plaintiff]

5      developed a deep vein thrombosis during the course of

6      his chemotherapy, by February 2012, [Plaintiff's]

7      blood thinners were discontinued. Additionally,

8      despite the fact that [Plaintiff] initially lost

9      weight before he began his chemotherapy treatments,

10      the record demonstrates he regained weight during and

11      after his treatment. At a follow-up appointment on

12      February 16, 2012, [Plaintiff] stated he had no

13      complaints; and physical examination revealed

14      generally unremarkable findings. Similarly,

15      diagnostic testing after February 2012[] revealed

16      generally normal findings.

17

18 (AR 21) (citations omitted). The ALJ went on to note that "[a]

19 PET scan performed in February 2012, demonstrated [Plaintiff] had

20 persistent, but nonmetabolicaly active lymph nodes" and

21 "[l]aboratory testing from February 16, 2012, revealed benign

22 findings." (AR 23, 453). Also, "[l]aboratory testing from May

23 and June 2012 showed [Plaintiff's] white blood count was slightly

24 elevated; but the results were otherwise unremarkable." (AR 23,

25 447). The ALJ finally noted that a July 30, 2012 PET scan

26 revealed Plaintiff "had a single left inguinal lymph node, with

27 low-grade metabolic activity that was not present in prior

28 studies" and a CT scan from the same day "reconfirmed that

several of [Plaintiff's] lymph nodes had significantly diminished in size after chemotherapy."  (AR 23-24, 644).

    The ALJ also discussed relevant "nonmedical evidence," such as Plaintiff's daily activities and the ALJ's own observations of Plaintiff.  SSR 96-8p, 1996 WL 374184 at 7.  For example, the ALJ noted that "during the hearing, [Plaintiff] admitted that as of February 2012, he only sees his physician every three months." (AR 21).   Regarding Plaintiff's knee pain, which Plaintiff alleged was severe following an unsuccessful surgery, the ALJ observed Plaintiff "ambulate around the hearing room," and noted that Plaintiff's "gait was normal and he did not use an assistive device for ambulation."  (AR 22).   Moreover, the ALJ stressed that Plaintiff admitted at the hearing "he was able to stand and/or walk for over an hour, and he acknowledged he was able to vacuum."  (Id.).   Plaintiff made similar statements during an August 13, 2012 appointment, where he "admitted that he was able to walk five to 10 blocks; he could climb stairs normally; and he stated he had only occasional moderate pain in his knee."  (AR 22, 638).

    In addition, the ALJ properly considered "[Plaintiff's] ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis ([such as] 8 hours a day, for 5 days a week, or an equivalent work schedule)."  SSR 96-8p, 1996 WL 374184 at 7.  The ALJ also described "the maximum amount of each work-related activity [Plaintiff] can perform based on the evidence available in the case record."  (Id.).

30

1    Specifically, the ALJ performed a separate analysis of steps four

2    and five in the five-step evaluation process after determining

3    Plaintiff's increased RFC. (AR 24-25). The ALJ concluded at

4    step four that Plaintiff was still unable to perform his relevant

5    past work as a construction worker. (AR 24). At step five, the

6    ALJ concluded Plaintiff could perform a limited range of

7    unskilled and light work. (AR 25-26).

8

9        The ALJ supported her findings at both steps by relying in

10   part on the testimony of Ms. Porter, a vocational expert. (AR

11   48-53). An ALJ may properly rely on the testimony of a

12   vocational expert where the ALJ poses a hypothetical

13   "contain[ing] all the limitations the ALJ found credible and

14   supported by substantial evidence in the record." Bayliss v.

15   Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005). Moreover, an ALJ

16   may rely on a vocational expert's testimony regarding the number

17   of relevant jobs in the national economy, as "[a]n ALJ may take

18   administrative notice of any reliable job information, including

19   information provided by a [vocational expert]." Id. at 1218

20   (citing Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995)).

21

22       At step four, the ALJ confirmed with Ms. Porter that

23   Plaintiff could not perform his past work as a construction

24   worker. (AR 49). At step five, the ALJ next asked Ms. Porter

25   whether jobs existed in the national economy for an individual

26   with Plaintiff's age, education, work experience and RFC. (AR

27   48-49). The ALJ specified six different hypotheticals for Ms.

28   Porter to consider, ranging from jobs requiring light to medium

                                    31

work; both with and without a sit/stand option; and accommodating brief breaks each day and absences each week due to chronic pain and ongoing medical treatment.  (AR 48-52).  Ms. Porter then testified that an individual sharing Plaintiff's age, education, experience and mental and physical limitations could perform light, unskilled work with a sit/stand option, such as a cashier, garment sorter, and production solderer.  (AR 51).  She testified that Plaintiff could perform medium work, but also with the opportunity for short daily breaks and weekly absences, as a laundry laborer, hospital cleaner, and industrial cleaner.  (AR 52).  Finally, she testified that Plaintiff could perform light, unskilled work, allowing for similar breaks and absences, as a sales attendant, mail clerk, and router.  (AR 52-53).  Ms. Porter also noted that all of these jobs existed in significant numbers in the national economy and in Plaintiff's local economy.  (AR 49-53).  The ALJ accepted Ms. Porter's testimony and concluded that "beginning February 17, 2012, [Plaintiff] has been capable of making a successful adjustment to work that exists in significant numbers in the national economy."  (AR 26).

1    **3.    The ALJ Cited Clear And Convincing Reasons For Finding**

2         **Plaintiff's  Subjective  Allegations  Less  Than  Fully**

3         **Credible**

4

5         The  ALJ  emphasized  that  Plaintiff's  subjective  testimony

6    regarding  the  severity  and  limitations  of  his  symptoms  as  of

7    February  17,  2012  "cannot  reasonably  be  accepted  as  consistent

8    with  the  medical  and  other  evidence,"  as  required  by  the  Ruling.

9    SSR 96-8p, 1996 WL 374184 at 7.

10

11        When  assessing  the  credibility  of  a  claimant,  the  ALJ  must

12   engage  in  a  two-step  analysis.   Molina v. Astrue,  674  F.3d  1104,

13   1112  (9th  Cir.  2012).   First,  the  ALJ  must  determine  if  there  is

14   medical  evidence  of  an  impairment  that  could  reasonably  produce

15   the  symptoms  alleged.   (Id.).   Then,  if  there  is,  in  order  to

16   reject  the  testimony,  the  ALJ  must  make  specific  credibility

17   findings.   (Id.).   In  assessing  the  claimant's  testimony,  the  ALJ

18   may  use  "ordinary  techniques  of  credibility  evaluation."   Turner,

19   613  F.3d  at  1224  (internal  quotations  omitted).  The  ALJ  may  also

20   consider  any  inconsistencies  in  the  claimant's  conduct  and  any

21   inadequately  or  unexplained  failure  to  pursue  treatment  or  follow

22   treatment.   Tommasetti v. Astrue,  533  F.3d  1035,  1039  (9th  Cir.

23   2008).   Additionally,  the  ALJ  may  discredit  the  claimant's

24   testimony  where  his  normal  activities  can  transfer  to  the  work

25   setting.   Morgan v. Comm'r of Soc. Sec. Admin.,  169  F.3d  595,  600

26   (9th  Cir.  1999).   Here,  there  was  medical  evidence  of  an

27   underlying  impairment.   However,  the  ALJ  articulated  specific,

28

33

clear and convincing reasons for discounting Plaintiff's testimony about the severity of her physical and mental symptoms.

The ALJ first summarized Plaintiff's allegations of symptom-related functional limitations in his testimony and written statements, noting specifically Plaintiff's claims of limitations caused by the knee surgery, post-chemotherapy treatment, and depression. (AR 22-23). The ALJ noted that "[Plaintiff testified he had an unsuccessful right knee surgery in 2012, and he continued to have severe knee pain . . . [Plaintiff] alleged he continued to have severe residual fatigue and weakness after he completed his chemotherapy . . . [and Plaintiff] and his wife alleged he has severe depression." (AR 22).

Then, the ALJ contrasted those subjective symptoms with evidence from the medical record to support the conclusion that "the claimant's allegations concerning the intensity, persistence and limiting effects of his symptoms are less than fully credible since February 17, 2012." (AR 22). Regarding Plaintiff's knee, the ALJ noted that although Plaintiff alleged his surgery failed and still caused severe pain, he presented at the hearing with a normal gait and without an assistive device. (AR 22). Moreover, Plaintiff "admitted he was able to stand and/or walk for over an hour, and he acknowledged he was able to vacuum." (Id.). Plaintiff made similar statements at a post-operative appointment and stated he only had occasional, moderate pain in the knee. (Id.).

34

The Court agrees with the ALJ's finding that Plaintiff's limited pursuit of mental health treatment undermined his subjective testimony. The ALJ noted although Plaintiff received medications for his depression, "there is no evidence [Plaintiff] was ever hospitalized for his mental impairments and he admitted he has not received ongoing mental health treatments," and that "[o]n several occasions, [Plaintiff] described his depression as "mild," and stated that his symptoms are infrequent." (AR 22-23). Were Plaintiff's symptoms as severe as he claimed, it seems likely that he would have needed and sought treatment more often than the record reflects, as he sought treatment for his other medical problems. Further, as a matter of law, the ALJ's reliance on and citation to Plaintiff's failure to seek more treatment, as part of the ALJ's evaluation of Plaintiff's subjective testimony, was proper. See Tommasetti, 533 F.3d at 1039 (an ALJ may consider many factors in weighing a claimant's credibility, including "unexplained or inadequately explained failure to seek treatment") (internal quotation marks omitted). Where, as here, "a claimant[] fail[s] to assert a good reason for not seeking treatment," an ALJ may consider this inaction as "cast[ing] doubt on the sincerity of the claimant's" subjective testimony. Molina, 674 F.3d at 1113).

The ALJ discussed similar reasons for discrediting Plaintiff's allegations of ongoing severe fatigue following chemotherapy treatment. The ALJ noted "the positive objective clinical and diagnostic findings since February 17, 2012 . . . do not support more restrictive functional limitations than those

assessed herein." (<u>Id.</u>). The ALJ pointed to the opinion of Plaintiff's treating physician, Dr. Andavolu, who noted Plaintiff's cancer was in complete remission and that Plaintiff was "doing well [and] . . . had no complaints" at a February 16, 2012 appointment. (<u>Id.</u>). The ALJ also supported her findings with evidence of unremarkable physical examinations and PET-CT scans ranging from February 2012 to late July 2012. (<u>Id.</u>). The ALJ also used these findings to discredit the testimony and written statements from Plaintiff's wife regarding Plaintiff's condition. (AR 23).

The ALJ also properly discounted Plaintiff's wife's testimony either because it was identical to Plaintiff's testimony (which, for reasons stated above, was properly discounted), her testimony was inconsistent with the medical evidence, or for other reasons germane to the witness, i.e., that as a lay witness she was not competent to render a diagnosis about Plaintiff.

For the above reasons, the Court finds the ALJ amply supported the determination that Plaintiff experienced medical improvement and an increased RFC as a result. The Court also finds the ALJ provided clear and convincing reasons for discounting Plaintiff's subjective testimony, as well as that of Plaintiff's wife.

1   **B.**   **The   ALJ   Properly   Discussed   And   Resolved   Any   Material**
2        **Ambiguities In The Evidence**

3

4        Plaintiff   claims   that   the   ALJ   erred   by   finding   non-
5   disability   despite   "numerous   ambiguities   [in   the   medical
6   evidence]   which   the   ALJ's   decision   failed   to   address."   (MSPC   at
7   3).   According   to   Plaintiff,   the   ALJ   was   obligated   to,   but   did
8   not,   "explain   how   any   material   inconsistencies   or   ambiguities   in
9   the   evidence   in   the   case   record   were   considered   and   resolved."
10  (MSPC   at   3-5)   (citing   SSR   96-8p,   1996   WL   374184   at   7).   The   Court
11  disagrees   that   the   ALJ   failed   to   address   any   material
12  ambiguities,   and   finds   that   to   the   extent   the   medical   evidence
13  created   any   ambiguities,   the   ALJ's   decision   addressed   and
14  resolved them with substantial evidence.

15

16      An   ALJ   has   a   duty   to   develop   the   record   "only   when   there   is
17  ambiguous   evidence   or   when   the   record   is   inadequate   to   allow   for
18  proper   evaluation   of   the   evidence."   Ludwig v. Astrue,_   681   F.3d
19  1047,   1055   (9th   Cir.   2012)   (quoting   Mayes v. Massanari,   276   F.3d
20  453,   459-60   (9th   Cir.   2001).   More   specifically,   that   duty
21  requires   the   ALJ   to   recontact   the   treating   physician   to   clarify
22  or   amplify   the   reports   if   the   medical   evidence   is   insufficient.
23  Tonapetyan v. Halter,   242   F.3d   1144,   1151   (9th   Cir.   2001).

24

25      If   the   ALJ   fails   to   develop   the   record   despite   ambiguous   or
26  inadequate   medical   evidence,   the   Ninth   Circuit   has   held   that
27  social   security   disability   cases   are   subject   to   the   same   harmless
28  error   rule   as   generally   applies   to   civil   cases.   Ludwig,   681   F.3d

37

at 1054 (citing McLeod v. Astrue, 640 F.3d 881, 887 (9th Cir.2011)).  Plaintiff "need not necessarily show what other evidence might have been obtained had there not been error, but does have to show at least a 'substantial likelihood of prejudice.'" McLeod, 640 F.3d at 888.

Here, Plaintiff claims the ALJ failed to resolve several ambiguities, but does not explain how any of them had a substantial likelihood of prejudicing Plaintiff, assuming any of Plaintiff's observations identified ambiguities at all.  (MSPC at 3-5).  For example, the ALJ observed that "during several medical appointments after February 17, 2012, Plaintiff reported no subjective complaints and was found to have few ongoing symptoms caused by his impairments," despite "other treatment records from the time period in question indicat[ing] that Plaintiff continued to suffer from symptoms and limitations caused by his Hodgkin's lymphoma . . ." (MSPC at 3).  Plaintiff claims that during two follow-up appointments after February 16, 2012, Plaintiff still reported "symptoms of moderate intensity, which were aggravated by walking and relieved by 'lying perfectly still.'" (Id. at 3-4).

Similarly, Plaintiff contends that physical examinations that found back pain and reduced range of motion during these same appointments are evidence of unaddressed ambiguities that nonetheless influenced the ALJ's decision.  (Id.).  Plaintiff also alleges that despite the ALJ's overall finding of medical improvement as of February 17, 2012, "[o]n August 14, 2012,

38

1   Plaintiff was diagnosed with peripheral neuropathy and prescribed
2   Neurontin (Gabapentin)." (Id. at 5). Lastly, Plaintiff points
3   to inconsistencies in the Cancer Center's "Interval History"
4   notes reflecting his appointments at the Center following
5   completion of his final chemotherapy treatment. Plaintiff notes
6   that the ALJ's finding of increased RFC recognized "by February
7   2012, [Plaintiff's] blood thinners were discontinued" but records
8   from the Cancer Center at that time state both that "Plaintiff
9   discontinued Coumadin 2 weeks ago" and that "he continues on
10  Coumadin." (MSPC at 4; AR 451).

11

12      The Court concludes that Plaintiff fails to demonstrate how
13  these observations demonstrate the medical record was inadequate
14  or insufficient to allow for a proper evaluation of Plaintiff's
15  condition as of February 17, 2012. Identifying evidence that is
16  contrary to an ALJ's decision does not by itself establish that
17  the decision is unsupported by substantial evidence or is
18  otherwise prejudicial to Plaintiff. See D.A.R.E. Am. v. Rolling
19  Stone Magazine, 270 F.3d 793, 793 (9th Cir. 2001) ("A bare
20  assertion of an issue does not preserve a claim[]") (internal
21  quotation marks omitted).

22

23      Moreover, even if Plaintiff's observations presented true
24  medical inconsistencies, such that the ALJ failed to address and
25  resolve them, the ALJ nonetheless provided enough evidence in
26  support of the non-disability finding that the errors would have
27  been harmless.

28

For example, the ALJ's RFC assessment provided several specific references to objective medical evidence indicating that Plaintiff experienced medical improvement as of February 17, 2012, all of which were noted "after careful consideration of the entire record." Though Plaintiff points to Cancer Center's allegedly inconsistent notations regarding Plaintiff's Coumadin prescription, the ALJ's review of the "entire record" more clearly indicates that no such inconsistency existed. Dr. Andavolu's treatment notes from February 16, 2012 state that Plaintiff's Coumadin prescription will be discontinued. (AR 451).

At subsequent medical appointments starting at least in March, 2012, Plaintiff did not list Coumadin as one of his medications. (AR 413). Coumadin is not listed under Plaintiff's medications at appointments on March 5, March 28, April 4, May 9, June 12, and August 20, 2012. (AR 413, 405, 402, 394, 384, 633). Considering the ample other evidence supporting the ALJ's conclusion that Plaintiff's medical condition improved, the Court does not view the alleged ongoing presence of Coumadin as a dispositive fact that Plaintiff continued to suffer from severe fatigue and weakness after February 2012. If anything, such evidence supports the inference that any lasting ambiguity over Plaintiff's Coumadin prescription after February 2012 is caused only by an oversight in Cancer Center's medical notes. Accordingly, in light of the above evidence provided by the ALJ,

the Court finds the alleged inconsistencies identified by Plaintiff to be harmless and insufficient to overcome the ALJ's increased RFC assessment and non-disability finding.

In sum, the ALJ's RFC assessment properly satisfied the narrative discussion requirement and provided substantial evidence to resolve any inconsistencies raised by Plaintiff.

**III.**

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner.

DATED:  November 13, 2014

/S/
_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS, OR ANY OTHER LEGAL DATABASE.**

41